## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ROBERT FREEDMAN, Individually and
on Behalf of All Others Similarly Situated,

No. _____

<u>CLASS ACTION Complaint</u>

Plaintiffs,

v.

MAGICJACK VOCALTEC LTD., YMAX
CORPORATION, DON C. BELL III, GERALD
VENTO, DONALD A. BURNS, RICHARD
HARRIS, YUEN WAH SING, ALAN HOWE,
IZHAK GROSS, TALI YARON-ELDAR, AND
YOSEPH DAUBER,

Defendants.

Plaintiff Robert Freedman, on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to his own acts and upon information and belief as to all other matters based on the investigation conducted by counsel, which included a review of, *inter alia* , SEC filings by magicJack Vocaltec Ltd., ("magicJack" or the "Company"), press releases, articles, and other public statements by Defendants, media and analyst reports and advisories about the individual Defendants and the Company, as well as other public information. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein for use after a reasonable opportunity for discovery.

<u>NATURE OF THE ACTION</u>

1.       Plaintiffs bring this action against the members of magicJack's Board of Directors (the "Board" or the "Individual Defendants") and magicJack for violations of Sections 14(a) and

20(a); Rule 14a-9, 17 C.F.R. 240.14a-9, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4) promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC").

2.      In proxy statements issued by the defendants, including the the April 19th Notice of Shareholders Annual meeting, (the "April 19th 2017 Proxy") and the subsequent July 31, 2017 (the "July 2017 Proxy"), Defendants misrepresented material facts concerning (1) the true value of Broadsmart, which was acquired in early 2016, and was grossly impaired financially (2) the true future prospects of Broadsmart were misstated and inaccurate in an effort which, combines, allowed three (3) the Individual Defendants to conceal material issues so that they could entrench themselves on magicJack's Board of Director's and (4) plunder the company by manipulating facts to obtain unwarranted compensation in connection with their attempt to sell the Company and extract compensation which, but for the misstatements of the combined Proxy Statements would not have been possible.

3.      For these reasons and as set forth in detail herein, the Company by the actions of the Individual Defendants have violated the federal securities laws. Plaintiff seeks to recover the damages resulting from the Individual Defendants' violations of laws. Judicial intervention is warranted here in order to rectify existing and future irreparable harm to the Company's stockholders.

**JURISDICTION AND VENUE**

4.      The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

5.      This Court has subject matter jurisdiction under 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

6.      Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant magicJack was headquartered within this District at all relevant times.

7.      In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

### Parties

8.      Plaintiff, Robert Freedman held and now hold substantial magicJack shares purchased throughout the Class Period and was denied fair corporate suffrage and damaged thereby. The attached certification is a true and correct record thereof.

9.      Defendant magicJack is an Israeli corporation whose principal executive offices are located at 12 Haomanut Street, Poleg Industrial Zone, Netanya Israel 4250445. The Company's subsidiary, YMax Corporation is located at 222 Lakeview Avenue Suite 1600, West Palm Beach, Florida, 33401. magicJack common stock trades on the Nasdaq under the symbol "CALL."

10.      Defendant Don C. Bell III is magicJack's President and Chief Executive Officer. Mr. Bell was nominated to the Company's Board on December 29, 2016, and was appointed Chief Executive Officer by the Board on March 9, 2017 and appointed a director vis a vis the April Proxy alleged to be defective by this complaint.

11.     Defendant Gerald Vento was magicJack's President and Chief Executive Officer until March 9, 2017 and serves as a current director of the Company.

12.     Defendant Donald A. Burns was a director and Chairman of the Board of magicJack during the Class Period

13.     Defendants Richard Harris is a current director of magicJack.

14.     Defendant Yuen Wah Sing is a current director of magicJack.

15.     Defendant Alan Howe is a current director of magicJack.

16.     Defendant Izhak Gross is a current director of magicJack.

17.     Defendant Tali Yaron Eldar is a current director of magicJack.

18.     Defendants Yoseh Dauber is a current director of magicJack.

19.     Defendants Bell, Vento, Burns, Harris, Sing, Gross, Howe and Yaron-Eldar are hereafter referred to herein as the "Individual Defendants." Further all the individual Defendants participated in preparation of and/or sought to benefit from the defective proxies as stated herein.

### SUBSTANTIVE ALLEGATIONS

### magicJack Explores Possible Acquisitions

20.     In April 2015, the Board engaged Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch") to act as financial advisor to the Company in connection with a solicitation of offers to acquire the Company.

21.     Between April 2015 and July 2015, at the direction of the Board, BofA Merrill Lynch contacted 35 potential strategic and financial buyers regarding a possible sale of the

Company. Confidentiality agreements were executed with 10 potential buyers and management presentations were provided to 9 interested parties.

22.     On July 15, 2015, the Company received formal indications of interest from two potential bidders. The highest bid was $8.00 per ordinary share. The Board reviewed the highest bid and determined that this price did not reflect the Board's view regarding the value of the Company. The Board resolved that the Company should instead move forward with the Board's strategic plan to increase shareholder value through possible growth initiatives and re-consider a sale process at a later date. Moreover, the Board decided to move forward with the previously authorized share buyback in response to a vocal minority of shareholders who had demanded a return of cash on the Company's balance sheet to shareholders.

23.     At the beginning of July 2016, Carnegie contacted the Company to express its interest in exploring a strategic transaction with the Company, including the acquisition of one or more of the Company's businesses, or the Company as a whole. Subsequently, senior officers of the Company attended an informal meeting with Carnegie in New York to discuss the possibility of a strategic transaction.

24.     On July 20, 2016, Carnegie sent a letter to the Company indicating it was interested in acquiring all of the outstanding ordinary shares of the Company for a price between $8.00 and $10.00 per ordinary share, subject to certain conditions regarding performance of due diligence and the negotiation of definitive agreements. Additionally, further negotiations were conditioned on the Company granting Carnegie a 45-day exclusivity period.

25.     On July 25, 2016, the Board received an unsolicited indication of interest from a third party ("Bidder A") in the range of $7.50 to $8.00 per ordinary share.

26.     On August 1, 2016, in response to the Board's request for a narrower price range, Carnegie sent a letter to the Company further indicating its interest in acquiring all of the outstanding ordinary shares of the Company at a proposed price range of $8.50 to $9.50 per ordinary share.

27.     On August 12, 2016, the Company responded to Bidder A informing that the offer was inadequate, but that the Board would consider an offer with a substantially increased purchase price.

28.     On August 15, 2016, the Company entered into a non-disclosure agreement with Carnegie (the "Carnegie NDA") to facilitate further discussions and more substantive due diligence concerning a proposed acquisition.

29.     On August 23, 2016, Kanen sent a letter to the magicJack

Board: Dear Magic Jack Board,

I have tried several times to engage you in an amicable, productive discussion for the purpose of creating value for all shareholders. Regrettably, you have not even replied to me. Therefore, I am writing this letter and look forward to a fruitful discussion.

First, I would like to point out that the current Board of Directors and executive leadership (exception of Mr. Izhak Gross) has functioned, virtually, with complete freedom and without outside pressure and/or shareholder activism. They have presided over an extremely disappointing and unsuccessful stretch of the last 3 years 8 months. Since the current Chairman and CEO have been installed as our leaders in January of 2013, our shares have declined from approximately $18.55 on January 2 to approximately $5.28 per share, a 71.5% decline. During this same period, our closest peer, Vonage Holdings Corporation, has gone from $2.37 per share on January 2, 2013 to $6.35 per share current price – a 168% return. 8x8 Inc. (which is focused on the enterprise space) has climbed from $7.47 per share to $12.94 per share – an 73.2% return.

While we are aware that no comparisons are ever exactly apples to apples, we do believe that we have some very distinct advantages/assets that are not being properly monetized. For example, we have our own CLEC network, one of the

lowest costs of telephone services in the world, an advanced wireless app, a very strong balance sheet, strong free cash flow and a solid, well-known brand.

During the last 3 $^{1}/_{2}$ years the current leadership has announced several growth initiatives dating back to Q1 2013, which we will touch on briefly:

International expansion
SMB/SOHO (small business)
App monetization


Sadly, through Q2 of 2016, we estimate that there is currently less than $1 million of revenue YTD from all of the initiatives combined.

In March, leadership spent $40 million in cash and stock to acquire B.S. (Broadsmart). In its first quarterly debut, B.S. did $3 million in revenue and $500,000 in EBITDA (management forecasted approximately $16 million revenue and $5 million in EBITDA for 2016).

Lastly, while churn has come down from 3% to 2.5% in the latest quarter, it is still considerably higher than our peers and unacceptable. In fact, at a target 1.8% churn, which we believe is attainable through "better execution," our core business would actually be stable, given our TTM gross line additions. Our competitors, on average, are well below that. All of the above being stated, we believe CALL shares are significantly undervalued, and are below their intrinsic value. We believe, with "effective execution" on the right growth initiatives, as well as an equally important focus on capital allocation, significant upside exists for CALL shareholders. However, the "status quo" must cease, and "correct change" be implemented. We are immediately calling for two simple yet extremely important changes.

A $50 million stock buyback to be executed over the next three years (a conservative estimate of our projected free cash flow, exception being if our stock no longer trades at a significant discount to our peers)

Addition of two new board members with proven track records of delivering high returns for shareholders. The additional criteria for the new board members will be that they have telco/VoIP experience and will be engaged with and exercise active oversight of management, holding them accountable to our goals of growing and reinventing the company. The clear objectives will be to:

1. Ensure growth of app revenue
2. Bring in international revenue
3. Grow "Magicjack for Business" (small enterprise)
4. Grow B.S. (enterprise)

5. Reduce churn to below 1.8% and in-line with our peer average, through more effective renewals, (focus on auto renewal) and improved customer service

6. Foster a culture of innovation and creativity that is married to execution and results

While we know some of these objectives are not different from what management and the board have stated already, we insist upon new outside talent that can successfully aid in the acceleration of growth. Sadly, the current management team has been ineffective in yielding results.

We believe significant upside exists when our articulated game plan is executed upon along with a large share repurchase. For example, if CALL were to generate organic growth next year, with revenue growing 5-9% and EBITDA at a faster rate, we believe the market will "reprice CALL shares" at or near parity with Vonage Holdings Corporation. Our math is as follows:

Total revenue of $112.5 million in 2017:
$86 million consumer core
$2.5 million app revenue
$16 million B.S. revenue
$6 million Magicjack for Business
$2 million Other

We would anticipate EBITDA $30 million full year with EBITDA margins increasing in 2H 2017 as revenue grows. If our share count is reduced to 13 million by 2017 year-end (through stock buyback) and we trade at a 12x EBITDA (Vonage Holdings Corporation currently trades at 14.93x EBITDA) our stock would trade at $27.20 per share before adding back cash.

We believe that CALL has many dedicated, talented employees, and as such, we believe they should be rewarded and participate in the future success of the company with stock options. Not just top level management. To all of these above unnamed, unrecognized employees, we thank you!

In summary, we look forward to constructive conversations with the board and implementation of these changes and significant value creation for all employees and shareholders.

30.     On August 23, 2016, the Board met to discuss the status of the negotiations with

Carnegie.

31.     On August 25, 2016, the Board received a revised unsolicited indication of interest from Bidder A stating that Bidder A believed it could "obtain a value range" for the purchase of the Company of $7.50 to $10 per ordinary share.

32.     On August 29, 2016, Israeli legal counsel, Herzog, Fox & Neeman ("Herzog") for David Kanen and Kanen Wealth Management, LLC (together, "Kanen") sent to the Company via facsimile two letters of notice (the "Kanen Nomination Notices") regarding Kanen's intention to nominate seven directors, pursuant to the Companies Law, to the Company's Board of Directors at the 2016 Meeting. The seven director candidates named in the Kanen Nomination Notices were Alan B. Howe, Anthony Ambrose, Jonathan M. Charak, William Austin Lewis, David Clark, Anthony Pompliano and Louis Antoniou.

33.     On August 31, 2016, the Board of Directors held a meeting to discuss the Kanen Nomination Notices and to vote on postponing the 2016 Meeting. After deliberation, the Board of Directors determined that it was necessary to delay the 2016 Meeting in order to fulfill the fiduciary duties of the members of the Board. The Board of Directors instructed the Company's U.S. legal counsel, Vinson & Elkins L.L.P. ("Vinson & Elkins"), to contact Kanen's U.S. legal counsel, Thompson Hine LLP ("Thompson Hine"), in order to request a telephonic conversation to discuss the matters raised by Kanen in its August 29 Letter along with the Kanen Nomination Notices.

34.     On August 31, 2016, Vinson & Elkins informed Thompson Hine that the Board of Directors was reviewing the Kanen Nomination Notices and conducting due diligence with respect to the credentials of the seven Kanen Nominees and that the Board of Directors would be open to interviewing the prospective nominees.

35.     On September 1, 2016, the Company issued a press release confirming that Kanen had delivered the Kanen Nomination Notices to the Company and to announce the postponement of the 2016 Meeting by the Board of Directors pending the Board of Directors' review of the Kanen Nomination Notices. Between September 2016 and December 2016, the Company engaged in negotiations with Kanen in an attempt to resolve the proxy contest prior to the filing of a proxy statement in connection with the 2016 Meeting.

36.     On September 1, 2016, the Board received a revised unsolicited verbal offer from Bidder A identifying the purchase range of $10 per ordinary share.

37.     On September 6, 2016, the Board of Directors held a meeting to discuss the Kanen Nomination Notices and Kanen's proposal. For the purposes of efficiency, the Board of Directors decided it was in the Company's best interests for the Board of Directors to form a special committee (the "Negotiating Committee") for the purpose of attempting to negotiate an accommodation with Kanen, the final terms of a settlement to be approved by the full Board of Directors prior to it being executed.

38.     On September 7, 2016, the Company entered into a non-disclosure agreement with Bidder A to facilitate further discussion regarding the proposed acquisition interest.

39.     On September 12, 2016, after further discussions between the Company and Carnegie and Carnegie's performance of due diligence on the Company (including several meetings with senior management), Carnegie sent a letter of intent to the Company communicating its offer to acquire all of the ordinary shares of the Company for $8.50 per ordinary share. Further negotiations were again conditioned on the Company granting Carnegie an exclusivity period, in this case concluding on November 6, 2016.

40.     On September 16, 2016, Carnegie sent an updated letter of intent with respect to the proposed transaction containing additional details and maintaining an $8.50 per ordinary share offering price, subject to an exclusivity period terminating November 11, 2016.

41.     On September 22, 2016, the Board met to discuss Carnegie's proposal. Following a robust discussion, the Board determined that a counteroffer to Carnegie at $10.00 per ordinary share was appropriate.

42.     On September 29, 2016, Carnegie sent an updated letter of intent to the Company. The letter generally confirmed the terms of its prior letter (including the $8.50 per ordinary share offer price), and included a 45-day "go shop" provision. On the same date, the Board met to discuss the letter from Carnegie and the progress of negotiations with Bidder A. After noting that the proposed price of $10.00 per ordinary share had been communicated to Carnegie, the Board voted not to pursue a transaction with Carnegie at a price of $8.50 per ordinary share.

43.     On October 6, 2016, the Company received a written offer from Bidder A offering $9.30 per ordinary share.

44.     On October 10, 2016, the Board decided that it would be appropriate to counter the offer received from Carnegie with a $10.00 per ordinary share proposal and give Carnegie a short period to respond. The Board also discussed the revised offer from Bidder A for $9.30 per ordinary share and determined to also counter this offer at $10.00 per ordinary share. Following the meeting, the Company sent a letter to Carnegie countering the offer made in Carnegie's letter of September 29, 2016 with, among other things, a purchase price of $10.00 per share and an exclusivity period terminating on November 7, 2016.

45.     On October 13, 2016, the Board received a counter-offer from Bidder A specifying $9.50 per ordinary share.

46.     On October 15, 2016, the Board met to discuss the offer from Bidder A of $9.50 per ordinary share and decided to move forward with due diligence for Bidder A in connection with the possible transaction. The Board also discussed negotiations with Carnegie and noted that Carnegie had informed the Company that it was not willing to increase its offer above $8.50 per ordinary share.

47.     On October 19, 2016, the Company entered into an exclusivity agreement with Bidder A, terminating on November 14, 2016, regarding a possible acquisition of the Company and due diligence requirements with respect to the Company by Bidder A.

48.     Between October 18, 2016 and November 14, 2016, the Company responded to extensive due diligence inquiries from Bidder A and negotiated terms of a Merger Agreement to be executed by the Company and Bidder A if Bidder A agreed to move forward with the transaction.

49.     On November 7, 2016, the Board discussed, among other things, the progress of Bidder A's due diligence efforts and negotiation of the merger agreement.

50.     On November 14, 2016, the exclusivity period with Bidder A ended. However, the parties proceeded with acquisition discussions for several weeks. Bidder A conducted due diligence until December and the parties continued to negotiate the terms of the merger agreement.

51.     On November 15, 2016, the Board discussed the fact that Bidder A had missed the November 14, 2016 deadline for finalizing the terms of the merger agreement as set forth in

the exclusivity agreement. The Board directed management to extend the deadline in the exclusivity agreement, either formally or informally, for an additional two weeks until November 29, 2016.

52.     On November 29, 2016, the Board discussed the fact that a definitive agreement with Bidder A had not been agreed to by the November 29, 2016 deadline and discussed how best to move forward. The Board concluded that they would be willing to extend exclusivity if Bidder A paid Company's expenses incurred in negotiations provided that , if Bidder A decline to agree to such terms, the Company would remain receptive to an offer, with a financing commitment, as described in the Exclusivity Agreement.

53.     On December 12, 2016, the Negotiating Committee met to discuss the candidacy of Mr. Howe to the Company Board. The same day, the Negotiating Committee made its recommendation to the full Board of Directors to approve Mr. Howe's nomination to the Board.

54.     On December 13, 2016, Vinson & Elkins notified Thompson Hine that Mr. Howe had been approved by the Negotiating Committee as the Kanen Designee.

55.     On December 15, 2016, the Board of Directors convened to further discuss the settlement negotiations.

56.     On December 20, 2016, Vinson & Elkins notified Thompson Hine that the Board of Directors had considered several prospects for the mutually agreeable position on the Board of Directors. The Board of Directors proposed Mr. Don C. Bell III.

57.      On December 25, 2016, Vinson & Elkins sent a director questionnaire to Mr. Bell.

58.     On December 27, 2016, the Negotiating Committee interviewed Mr. Bell.

59.     On December 29, 2016, Mr. Bell sent his completed director questionnaire. On the same day, the Negotiating Committee met to discuss Mr. Bell's candidacy to the Board. The same day, the Negotiating Committee made its recommendation to the full Board of Directors to approve Mr. Bell's nomination to the Board.

60.     On December 29, 2016, the Board was convened to discuss the progress of the settlement negotiations with Kanen. In order to bring the matter to a conclusion, the Board resolved that it would be necessary to set a date for the 2016 Meeting and submit both the Company Nominees and the Kanen Nominees to a vote of the shareholders, as requested by Kanen and required by Israeli law. In furtherance of what the Board believed to be the best interests of the Company's shareholders and based on the feedback received from Kanen over the previous months, the Board resolved to increase the size of the Board to create two new directorships effective as of the "2016 Meeting" and to nominate Mr. Howe, the nominee of Kanen, and Mr. Bell, a proposed independent director, for election to vacant seats at the 2016 Meeting. The Board then voted to approve and file the preliminary version of its Proxy Statement.

61.     On December 30, 2016, the Company filed its preliminary proxy statement and issued a press release announcing the Board's decision. Concurrently with the filing, Vinson & Elkins called Thompson Hine, informing him that the Board had determined that a settlement on the terms required by Kanen was not in the best interest of shareholders and, therefore, the Board decided to proceed with the proxy contest to allow the shareholders to vote on the election of directors.

62.     On January 4, 2017, Carnegie contacted the Company to express its displeasure that the Company had not entered into a strategic transaction, but did not indicate that it would initiate a proxy contest to take over control of the Board.

63.     On January 5, 2017, Carnegie issued a press release announcing its intent to nominate a slate of directors for election to the Board at the 2016 Meeting and Carnegie's Israeli legal counsel, Meitar Liquornik Geva Leshem Tal ("Meitar"), submitted to the Company a proposal (the "Carnegie Director Proposal") on behalf of Paul M. Posner to nominate seven directors, pursuant to the Companies Law, to the Company's Board of Directors at the 2016 Meeting.

64.     On January 6, 2017, the Company issued a press release, filed with the SEC on Form 8-K, acknowledging receipt of the Carnegie Director Proposal and stating that the Company was reviewing the nominations provided thereby pursuant to its corporate governance policies and the requirements of the Companies Law.

65.     On January 9, 2017, the Company received an unsolicited indication of interest from a third party ("Bidder B") to acquire the Company for a purchase price in excess of the price previously offered by Carnegie.

66.     On January 11, 2017, the Company, through Vinson & Elkins, gave notice to Carnegie under the Carnegie NDA that the Company is required to disclose its negotiations with Carnegie in the Company's proxy statement.

67.     On January 12, 2017, Israeli legal counsel for the Company, Yigal Arnon & Co. ("Yigal Arnon") sent a letter to Meitar on behalf of the Company informing them that the information provided to the Company in the Carnegie Director Proposal did not meet the

requirements of the Companies Law, providing Meitar with a detailed list of the information missing with respect to each Carnegie Nominee, and stating that the Carnegie Proposal was thus invalid as a matter of law and would not be included in the Company's amended preliminary proxy statement.

68.    On January 13, 2017, the Company filed its amended preliminary proxy statement.

69.    On January 18, 2017, Yigal Arnon sent a letter to Meitar on behalf of the Company informing Meitar that Carnegie had failed to provide certain missing information with respect to the Carnegie Nominees in the January 13 Meitar letter and, as such, the Carnegie Proposal remained invalid as a matter of law. The Company again provided a detailed explanation of the missing information with respect to each Carnegie Nominee.

70.    On January 18, 2017, Carnegie filed a Schedule 14N with the SEC providing notice to the Company of its intent to have the Carnegie Nominees included in the Company's Proxy Statement.

71.    On January 19, 2017, the Company received a letter from Meitar on behalf of Carnegie disputing the Company's interpretation of the Companies Law in the January 18 Yigal Arnon letter, but nonetheless provided the required supplemental information with respect to the Carnegie Nominees.

72.    On January 20, 2017, the Company received a revised unsolicited indication of interest from Bidder B, reiterating its proposed purchase price and providing a term sheet concerning the proposed structure of the transaction.

73.     On January 23, 2017, Yigal Arnon sent a letter to Meitar on behalf of the Company informing Meitar that the Carnegie Proposal, as supplemented by the January 13 Meitar Letter and the January 19 Meitar Letter fully complied with the requirements of the Companies Law and as such the Company would include the Carnegie Proposal and the Carnegie Nominees in its Proxy Statement for the 2016 Meeting.

74.     On January 25, 2017, the Company received a letter from Cede & Co., the record holder of the shares beneficially owned by Carnegie, demanding inspection of certain shareholder records, including the list of non-objecting beneficial owners (the "NOBO List") of the Company pursuant to New York law. Cede & Co. disclaimed any interest in the shareholder records of the Company and further stated that its sole interest in obtaining the Company's shareholder records was to provide them directly to Carnegie.

75.     On January 25, 2017, Kanen filed a Schedule 14N with the SEC providing notice to the Company of its intent to have the Kanen Nominees included in the Company's Proxy Statement.

76.     On January 27, 2017, Yigal Arnon sent a letter to Meitar on behalf of the Company indicating that it would provide Cede & Co. with lists of the Company's registered shareholders and principal shareholders upon payment of the Company's expenses incurred in providing such lists, as required by the Companies Law, but that it was not required to and did not intend to release any additional confidential information concerning the Company's shareholders, including the NOBO List.

77.     On January 31, 2017, Yigal Arnon received a letter from Meitar demanding that the Company publish a revised agenda for the 2016 Meeting including the Carnegie Nominees

by the close of business on January 31, 2017 pursuant to Meitar's interpretation of certain requirements of the Companies Law and regulations promulgated thereunder and stating that Carnegie would commence litigation against the Company if the agenda was not published by such time.

78.     On January 31, 2017, Yigal Arnon sent a letter to Meitar disputing Meitar's interpretation of the Companies Law and regulations promulgated thereunder as requiring the Company to file a revised agenda for the 2016 Meeting by January 31, 2017 and stating that the Company intends to publish an updated agenda for its 2016 Meeting in full compliance with all requirements of the Companies Law at as soon as practicable.

79.     On January 31, 2017, Yigal Arnon received a letter from Meitar reiterating its belief that, under the Companies Law, the Company was required to publish a revised agenda for the 2016 Meeting including the Carnegie Nominees by the close of business on January 31, 2017 and indicating its intent to initiate litigation against the Company.

80.     On January 31, 2017, the Company and Kanen entered into a settlement agreement whereby Kanen agreed to withdraw his slate of nominees for election to the Board at the 2016 Meeting and to vote all shares controlled by Kanen in favor of the Company Nominees.

81.     On January 31, 2017, Bidder B provided the Company with a letter from a third party potentially interested in financing Bidder B's proposed acquisition of the Company, subject to satisfactory completion of due diligence.

82.     On February 1, 2017, Akerman reached out to Wiggin and Dana to inquire whether Carnegie remained interested in pursuing an acquisition of the Company and if so, to

request that Carnegie submit a formal offer to the Board. Wiggin and Dana responded that they would communicate this to their client and then get back to Akerman.

83. On February 2, 2017, the Company entered into a non-disclosure agreement with Bidder B to facilitate further discussions regarding a proposed acquisition.

84. On February 2, 2017, Paul M. Posner, founder of Carnegie Technologies, commenced litigation against the Company by filing a motion for provisional relief in the District Court for the Central District of Israel (the "District Court") requesting that the District Court order the Company to amend its proxy materials to include the Carnegie Proposal and to deliver all shareholder records of the Company to Mr. Posner.

85. On February 2, 2017, the District Court denied Mr. Posner's motion for temporary relief in ex parte on the grounds that the date for the 2016 Meeting had been set for February 28, 2017 and notice of the 2016 Meeting was published at the end of December 2016. In addition, the District Court instructed the Company to submit its response to the motion by February 7, 2017.

86. On February 2, 2017, the Company filed a revised preliminary version of this Proxy Statement which included the Carnegie Nominees, as required by the filing of the Carnegie Schedule 14N and Israeli law.

87. On February 6, 2017, Bidder B commenced due diligence on the Company.

88. On February 7, 2017, the Company submitted a response to Mr. Posner's motion for provisional relief requesting that the District Court dismiss Mr. Posner's motion in limine or on its merits for various reasons, including the fact that the Company had already amended its preliminary proxy statement to include the proposed nominee directors requested by Carnegie.

89.     On February 8, 2017, the District Court ruled that if Mr. Posner did not advise the District Court that he consents to the resolution proposed in the Company's response to the motion, according to which the Company would amend its proxy materials to include the Carnegie Proposal in its definitive proxy statement, the motion would be heard on February 12, 2017, at 13:00 pm (Israel time) in the presence of both of the parties.

90.     On February 8, 2017, at the instruction of the Board, representatives of BofA Merrill Lynch reached out to Carnegie's financial advisor to again inquire whether Carnegie intended to submit a formal offer to acquire the Company and to state that the Board remained open to reviewing such an offer.

91.     On February 9, 2017, the Company filed a revised preliminary version of this Proxy Statement which moved the date of the 2016 Meeting to March 30, 2016 in order to comply with certain requirements of the Companies Law and certain rules and regulations of the SEC.

92.     On February 13, 2017, Carnegie's financial advisor communicated to BofA Merrill Lynch that Carnegie was interested in engaging in transaction discussions with the Company and wished to refresh its prior due diligence review.

93.     On February 15, 2017, Carnegie submitted a due diligence request list to the Company but did not submit a formal offer to acquire the Company.

94.     At or about this time, magicJack resisted efforts by a group of San Antonio-based investors led by Carnegie Technology Holdings LLC's CEO, Paul Posner, to take the company private and replace the board of directors by omitting Carnegie's nominees for magicJack's board from the slate of nominees presented to magicJack's shareholders.

95.     At this time magicJack claimed it did not include Carnegie's nominees in its proxy statement to shareholders because its proposal was deemed legally insufficient, according to an amended proxy statement filed Jan. 13. MagicJack determined that the information in Carnegie's proposal "did not meet the requirements of the companies' law and was thus invalid as a matter of law."

96.     Carnegie had in fact been negotiating with magicJack since July 2016, in an effort to buy the company outright. The two businesses were going back and forth on the price — from $135 million up to $158 million, or $10 per share.

97.     In August 2016, magicJack's board of directors declined to sell the company for $8.50 to $9.50 per share.

98.     Carnegie persisted, and the two parties entered into a nondisclosure agreement to continue negotiating, but magicJack's counter offer was firm at $10 per share.

99.     One day before Carnegie Technology announced it was prepared to buy magicJack for $8.50 per share, the investors sent them one more letter expressing discontent, but didn't tell magicJack that they were going to "initiate a proxy contest to take over control of the board," according to a filing with the U.S. Securities and Exchange Commission.

100.    The Company then send a letter to shareholders saying that Carnegie hasn't offered any ideas on increasing shareholder value since the two began talking last July.

101.    "We believe it is crystal clear that Carnegie launched its last minute proxy contest to install its handpicked directors in order to pave the way for Carnegie to sell your Company to itself at a low-ball price," magicJack's board of directors wrote in a letter announcing its annual

shareholder meeting was scheduled for April 19. They urged investors to reject Carnegie's nominees.

102.    MagicJack posted fourth quarter revenues for 2016 of $23.8 million, a 3.2 percent drop from the same quarter in 2015. For the entire year, revenue was down more than $3 million to $97.3 million, a 3.7 percent drop from $101 million in 2015.

103.    After "carefully considering" views from Kanen Wealth Management, which had nominated seven directors, the Company is called for an expansion of the board to include Kanen nominee Alan Howe and independent candidate Don C. Bell III (recommended by a large shareholder activist).

### The Broadsmart Acquisition and Writedown

104.    In March 2016, magicJack acquired substantially all the assets in North American Telecommunications Corporation ("Broadsmart") for $40 million. MagicJack acquired Broadsmart using more than half of its cash. As Defendants revealed in an announcement to shareholders: This Broadsmart Acquisition was highly material as not only did the acquisition require the Company to empty out most of its coffers, it was highly material to the shareholders as magicjack was experiencing rapid churn in its core business of retail customers. The deal also provided for a $2 million earn out tied to the achievement of 2016 revenues of $15.6 million. This was believed to be a major accomplishment as directors acquired "Highly profitable operations with 30%+ Operating and 35%+ EBITDA margins" growing at 20% as described in detail below:

- "magicJack Announces Agreement to Acquire Premier UCaaS Provider Broadsmart."

- "Leading hosted UCaaS provider for medium-to-large enterprise customers."

- "Highly profitable operations with 30%+ Operating and 35%+ EBITDA margins in 2015."

- "Forecasting 20%+ year-over-year growth in sales in 2016."

- "Purchase price of $40 million, consisting of $38 million in cash and $2 million of stock."

- "Two founders to remain with the business as CEO and President, respectively."

WEST PALM BEACH, Fla. and NETANYA, Israel, March 15, 2016 (GLOBE NEWSWIRE) – "magicJack VocalTec Ltd. (Nasdaq:CALL), a leading VoIP cloud-based communications company, today announced that it has entered into an agreement to acquire substantially all of the assets of North American Telecommunications Corporation d/b/a Broadsmart, a leading hosted UCaaS provider for medium-to-large multi-location enterprise customers. The purchase price for the acquisition is $40 million, consisting of $38 million in cash and $2 million in ordinary shares of magicJack. There is also a $2 million earn out tied to the achievement of 2016 revenues of $15.6 million. The acquisition is expected to close in the next 30 days."

"Broadsmart has a track record of designing, provisioning and delivering complex Unified Communication as a Service (UCaaS) solutions to blue chip corporate customers on a nationwide basis. It has expertise in servicing enterprises with hundreds-to-thousands of locations. The business is highly profitable, having generated approximately $13 million in revenues and $4.6 million of EBITDA in 2015, an EBITDA margin of over 35% on an unaudited basis. For 2016, the Broadsmart business is forecasting over 20%  year-over-year growth in sales."

105.   "The two founders of Broadsmart, Todd Correll and Tom Tharrington, will remain with the business as CEO and President, respectively, of Broadsmart Global, Inc., a newly formed wholly-owned subsidiary of magicJack Vocaltec, Ltd. At the time of the closing, the Broadsmart founders also will each receive 500,000 stock options, 50% of which will vest in even annual increments over the next three-year period if the founders remain employed with the company as of each respective vesting date, and 50% of which will vest over the next three-year period if the company achieves designated revenue and EBITDA targets. The options will be issued to the Broadsmart founders outside of the Company's 2013 Stock Incentive Plan as an inducement award in accordance with NASDAQ Stock Market Rule 5635(c)(4)."

"We are pleased to be diversifying beyond our core business into UCaaS targeting high end SMB and enterprise customers, " said Gerald Vento, President and CEO of magicJack VocalTec, Ltd. "Todd and Tom are exceptional entrepreneurs that have built a highly profitable and fast growing business. They have demonstrated that they know how to sell and service large enterprise customers with complex needs at thousands of locations in multiple geographies. We intend to fully support them in maximizing their promising pipeline for new business. We also look forward to exploring opportunities for Broadsmart to realize synergies by leveraging magicJack's proprietary low cost infrastructure ."

"We are excited to be combining Broadsmart with magicJack VocalTec," said Todd Correll, Broadsmart's CEO. "It will provide us greater resources to deliver additional managed services and solutions to our customers and channel partners. Tom and I look

forward to providing the same high quality, high touch customer service that Broadsmart's customer base has come to expect from the company ."

106.    In the fall of 2016, magicJack conducted a third party valuation of Broadsmart. According to magicJack's 2016 Form 10-K, filed on March 16, 2017, "This valuation yielded an estimated fair value of $1.7 million for the Broadsmart tradename. This tradename was recorded as an identifiable intangible asset with an indefinite life at a carrying value of $2.2 million. As a result, an impairment loss of $0.5 million was recognized in General and Administrative expense for the fourth quarter of 2016 under the Enterprise segment of the Statement of Operations related to the tradename."

107.    Worse, in fact by January 24th, 2017, its was announced its Senior Vice President of Enterprise would be leaving the Company. Despite being there for over one year, SVP Keith Reed was denied any severance or accelerated vesting by the Company.

108.    Nonetheless, magicJack failed to inform investors of any further impairment, even when the March 2017 proxy and 2016 Form 10-K were filed.

109.    In fact, in the 2016 Form-10K, magicJack directly misrepresented Broadsmart's value in order to provide false comfort or independent basis for investors involvement by stating "[a]lthough the acquired Broadsmart business has underperformed compared to our expectations, we believe that the underlying fundamentals of the Broadsmart business and the exhibited market opportunities for growth remain consistent with our understanding and analysis of the business at the time of acquisition."[1]

---

[1] In Q3, the Company had an unusual expense related to the "transaction" fees of approximately $800,000.00. The legal, accounting and valuations fees associated with Defendants look into the bowels of Broadsmart. Previously, the Defendants had failed to truly conduct an objective evaluation of Broadsmart's alleged clients or its so called pipeline. When the transaction

110.    It was not until magicJack released is 1Q 2017 results that investors realized the extraordinary impairment of approximately 50% in Broadsmart's value. In a Form 10-Q filed on May 10, 2017, Defendants announced that "Broadsmart received notification in early April 2017 that a major customer would not be renewing its contract and management anticipates the loss of another one of the Enterprise segment's significant customers. Combined, these customers accounted for approximately 29% of the Enterprise segment's revenue in 2016. We considered the revised projections and customer losses to be indicators of potential impairment, and accordingly performed impairment testing of the segment's long-lived assets and indefinite-lived intangible assets, including goodwill, as of March 31, 2017 utilizing the revised projections."

111.    Customer base of large, blue-chip enterprises with multiple locations and high-touch implementation and customer service requirements appeased investors until the truth concerning its value was admitted to sending Magicjack's shares spiraling. And since Broadsmart's revenue model is highly recurring in nature: it sells its core service to customers on contracts ranging from 1-5 years and receives revenue monthly on a per-user basis, with assumptions of renewal multiple times, it would be impossible for Defendants not to know Broadsmart's wasn't materially impaired both by Q3 16, or 4-19-17 the date of the April Proxy statement vote.

---

analysis was complete, Defendants clawed back the $2 million dollar earnout as reflected in its Q3 2016 for the period ending Sept 31, 2016. This $2 million earn out was " tied to the achievement of 2016 revenues of $15.6 million." This $15.6 in 2016 revenues was premised on the claim Broadsmart business was justifiably forecasting over 20% year-over-year growth in sales and far from seeing growth The Defendants witnessed massive declines and were also aware that the large contracts Broadsmart had representing over 30% of its business were unlikely to renewed. These particular contracts are long term contracts 3 to 5 years with the expectation of renewing them 3 to 5 times. Defendants using an amortization table of 17 years for the contracts. Contracts of this nature do not disappear overnight yet in just two quarters, it was obvious there was not even a

chance of achieving anything close to what was represented- Defendants clawed back 100% of what they could - the $2 million earnout.

112.    In response, magicJack's attempted to blame much of this impairment on the loss of a couple of customers. However, as early as the fall of 2016, magicJack knew with relative certainty of the reduced value of Broadsmart due to the third party valuation.

### March 2017 Proxy

113.    On March 15, 2017, magicJack issued a proxy stating:

Dear Fellow Shareholders:

We are writing to you today regarding magicJack's 2016 Annual Meeting of Shareholders ("2016 Annual Meeting"), which will be held on Wednesday, April 19, 2017. You are being asked to make an important decision regarding the future of magicJack. We urge you to protect the value of your investment by voting "FOR" magicJack's experienced and highly qualified director nominees: Mr. Donald A. Burns, Mr. Izhak Gross, Mr. Richard Harris, Mr. Alan B. Howe,

Dr. Yuen Wah Sing, Mr. Gerald Vento, and Mr. Don C. Bell III, who was recently appointed the Company's Chief Executive Officer.
                              ***
The Company has been – and continues to be – in negotiations with numerous bidders who have expressed an interest in acquiring the Company, including with Carnegie. To date, the Board has received several indications of interest for the Company that are meaningfully higher than the non-binding, highly-contingent, $8.50 offer from Carnegie – including an offer of $9.50 per share with committed financing. The Company has entered into confidentiality agreements with all bidders (including Carnegie) and due diligence is well underway. The Board has also formed a special committee of independent directors to run a comprehensive strategic alternatives process. As part of this process, we are actively reaching out to other potential strategic and financials buyers of the Company. Your Board will be carefully considering every offer for Company and is focused on obtaining a bid that delivers full value to all shareholders.
                              ***
Your Board and Management are excited about the possibilities for restoring growth at magicJack under Mr. Bell's leadership. The seeds of change that we planted to evolve the business have already taken root

and magicJack is well-positioned to harvest the fruits of its labor. The opportunity for meaningful future value creation is reflected in our growing Broadsmart pipeline, which currently includes large enterprise opportunities . This includes active pilots with two large North American businesses with thousands of locations, both of which would contribute significant monthly recurring revenue. *(emphasis added)*

113. This proxy statement intentionally contained at least the following materially false and misleading statements and/or omissions:

a. The April proxy statement misrepresented "meaningful future value creation is reflected in our growing Broadsmart pipeline" given that magicJack knew that Broadsmart was then materially impaired by Q3 2016. In Q1 2017, (for the quarter ended 3-31-2017) Defendants demonstrated this fact by writing down the value of Broadsmart due its absence of pipeline or customers. That only two delayed quarters later magicJack would write the majority of Broadsmart's value, including 100% of its goodwill and conceding the value of its "customers and know how" we're all grossly overstated. Moreover, in Q3, 2016, MagicJack had already written back a $2 million earn out payment, essentially clawing back all the potential monies available associated with that transaction.

b. It failed to disclose that the Individual Defendants hid the information about Broadsmart's material impairment and instead falsely claimed that Broadsmart was positioned for and in fact had a growing pipeline of recurring revenues.

The above was intended to allow the Individual Defendants did this to entrench themselves at magicJack and stop Carnegie from de-slating the Individual Defendants it had sponsored

28

114.   On April 19, 2017, The Individual Defendants were elected to the magicJack board.[2]

115.   On May 5, 2017, the MagicJack filed its 10-Q and issued more commentary on the Broadsmart impairment. Additionally, Broadsmart received notification in early April[3] 2017 that a major customer would not be renewing its contract and management anticipates the loss of another one of the Enterprise segment's significant customers." Combined, these customers accounted for approximately 29% of the Enterprise segment's revenue in 2016. Management considered the revised projections and customer losses to be indicators of potential impairment, and accordingly performed impairment testing of its long-lived assets and indefinite-lived intangible assets, including goodwill , as of March 31, 2017 utilizing its revised projections

for Broadsmart. Based on the impairment indicators as of March 31, 2017 discussed above, the Company engaged an independent third party to perform a valuation of the Enterprise reporting unit's long-lived assets and indefinite-lived intangible assets, including goodwill, as of March 31, 2017.

---

[2] While Plaintiff claims the Defendants were on notice of the Broadsmart issues long before Defendants claimed, Defendants would later admit they discovered those issues before the shareholder vote of April 19th, 2017. Defendants own admissions tie this notice of Broadsmart's accounting debacle to September 31, 3016 and then again March 31, 21017, and one last time to "early April." For Q1 2017, (March 31, 2017) Defendants admitted Broadsmart was materially impaired. While Defendants try to mischaracterize the accounting meltdown at Broadsmart as a "subsequent event" "in early April," the shareholder vote was long thereafter after "on April 19, 2017." Defendants manipulated the shareholder vote by misstating facts (about Broadsmart) which Defendants were keenly aware of.

[3] While Defendants were clearly on notice of Broadsmart being a nuclear disaster by Q3, Defendants admit that even these results for March 31,2017 and yet try to "qualify" the disclosure as a subsequent event for March 31,2107, as early April 2017. the April Proxy Statement for shareholder meeting in late April or April 17, 2017.

The valuation estimated the fair value of Broadsmart's identified intangible assets not subject to amortization based on the relief from royalty method, which requires an estimate of a reasonable royalty rate, identification of relevant projected revenues and expenses, and selection of an appropriate discount rate. The Company recorded an impairment charge of $0.9 million for the carrying value in excess of the fair value.

For long-lived assets, including definite-lived intangible assets subject to amortization, management totaled the undiscounted cash flows expected to result from the use of these assets and their eventual disposition and noted that the sum did not exceed the carrying amount of the assets, indicating further impairment testing was necessary for these assets as of March 31, 2017. The estimated fair value of definite-lived intangible assets subject to amortization as of March 31, 2017, was based on discounted future cash flows. The Company recorded impairment losses of $15.7 million for the carrying value in excess of the fair value.

Based on a discounted future cash-flows approach, the third party valuation estimated the fair value of the Enterprise reporting unit to be $17.9 million. Recognition of the goodwill impairment resulted in a tax benefit which was recorded as a deferred tax asset. Since the deferred tax asset increases the carrying value of the reporting unit, it would result in an additional impairment. The accounting guidance requires an entity to calculate the impairment charge and the deferred tax effect using a simultaneous equation method, which effectively grosses up the goodwill impairment charge to account for the related deferred tax benefit so that the resulting carrying value does not exceed the calculated fair value.

The simultaneous equation calculation resulted in an impairment charge that exceeded the carrying value of the goodwill. Since the guidance limits goodwill

impairments to the carrying value of goodwill, the Company recognized an impairment loss of $14.9 million, the full carrying value of goodwill. In total, impairment losses of $31.5 million were recognized in operating expenses of the Enterprise segment for the three months ended March 31, 2017.

116.    In total, impairment losses of $31.5 million were recognized in operating expenses of the Enterprise segment for the three months ended March 31, 2017.  The impaired assets were itemized below (in thousands): While the Defendants had maintained the "Customer Relationships were worth over $19.5 million, Defendants admitted in fact "fair value" of those relationships was overstated by 500%, that "fair value of "process now how" and "trade-name" were overstated by more than 200% and worse the so called "goodwill" which accounted for nearly $15 million, was in fact worth nothing, or "zero." In summary, this so called "highly profitable entity" the Company spent $40m for was worth only $5.6 million.  These facts run contrary to the Defendants' claims about Broadsmart in the Proxy Statements and 10-K. In fact, this disclosure of Broadsmart's impairment sent MagicJack's shares into a perpetual daily decline for weeks - declining from $8.40  to $6.40 - a market cap loss of over $30 million".

|  | Carrying Amount | Fair Value | Impairment |
|---|---|---|---|
| Customer Relationships | $19,572 | $4,400 | $15,172 |
| Process Know How | 974 | 400 | 574 |
| Tradename | 1,700 | 800 | 900 |
| Goodwill | 14,881 | - | 14,881 |
|  | 37,127 | 5,600 | 31,527 |

117. Defendant's intent was to plunder the company by asking the shareholder to approve additional unwarranted compensation. On July 24, 2017 magicJack issued a proxy stating:

We are furnishing this proxy statement to the holders of ordinary shares, no par value, of magicJack VocalTec Ltd., a company organized

under the laws of the State of Israel (referred to as "we," "us" or the "Company"), in connection with the solicitation by the Company's board of directors (the "Board") of proxies for use at a special meeting of shareholders and any adjournment thereof (the "Meeting"). The Meeting will be held on July 31, 2017 at 10:00 a.m. local time at the offices of Bryan Cave LLP, 1290 Avenue of the Americas, 35th Floor, New York, NY 10104.

At the Meeting, you will be requested to approve the following matters:

1. To approve the Employment Agreement, Stock Option Agreement and Restricted Stock Agreement with the Company's president and chief executive officer, Don Carlos Bell III;
2. To approve the amendment and restatement of the Company's 2013 Stock Incentive Plan to increase the number of shares that may be issued under the plan and to make certain other changes;
3. To approve the amendment and restatement of the Company's 2013 Israeli Stock Incentive Plan to increase the number of shares that may be issued under the plan and to make certain other changes;
4. To approve an amendment to the Company's Amended Compensation Policy to facilitate modification of the compensation paid to non-employee members of the Company's Board; and
5. To approve changes to the compensation paid to non-employee members of the Company's Board."

118.   This proxy statement contained materially false and misleading statements and/or omissions, while pleading to the shareholders to approve their new pay packages.

119.   For example, in a Proxy Supplement issued before the shareholder vote for the July 31, 2017 Proxy, Defendants claimed their new activist CEO plant could not be paid without their approval, yet without disclosing the truth behind the Defendant's knowledge and purpose of delaying the Broadsmart impairment and simultaneously the sale of the company as both would deprive the defendants of the millions of dollars they collectively sought to extract as the supplement to the July Proxy stated:

120.

    a. It failed to disclose that the Individual Defendants, in connection with the April 2017 Proxy hid information about (1) Broadsmart's true value, and (2) the Individual Defendants did this to entrench themselves at magicJack (3) and in order to time disclosure of its accounting disaster until after they had prevented being de-slated (4) delay the sale of Magicjack until positioned themselves to enrich themselves to benefit from the change of control provisions and (5) award the newly minted directors and CEO with millions in payments for issuing two defective proxies and denying shareholders fair corporate suffrage.

121.    This information was material to voting shareholders, the vote should have not taken place unless such information was fully revealed.

### Change In Control Provisions

122.    magicJack was supposedly attempting to "maximize shareholder value" when it was first approached with an offer to buy the Company for since 2016. However, the actions have been designed to entrench the current directors, appease some activists and fight others. In fact with some activists, the MagicJack even conceded to recommend the activists' proposed directors onto the MagicJack Board. Then, with the new directors on board, the Individual Defendants sought to stall both the sale of the company and simultaneously while stall the true facts related to disclosure of its accounting problems until after they're directorships remained intact. Thereafter, the Defendants claimed to have fully financed offers in play and in so doing, Defendants obtained, approved and preserved certain trigger a change of control provisions and even new employment

agreements. This change of control provisions and new employment agreements much more lucrative than if they are simply removed from their positions.

123.    For example, July 17, 2017, in a Supplement to the July 31 Proxy, Defendants pleaded with shareholders.

124.    Dear Shareholders:

We are reaching out to all shareholders about our upcoming Special Meeting of Shareholders to be held on Monday, July 31. The purpose of the special meeting is to obtain the vote of our shareholders to approve the employment package for our new Chief Executive Officer, Don Bell, and to approve changes to our Stock Incentive Plans, our Compensation Policy and the compensation paid to our outside directors.

These are not advisory votes. Your approval of the compensation of our CEO and our outside directors is required under Israeli law. Since joining the Company in March of this year, our CEO has not been paid because we do not yet have a shareholder-approved contract for him. Until shareholder approval, he cannot be paid for his services to our company. This is a critical time for our company and we need to ensure that our CEO can remain in place and be fairly compensated for his services, with appropriate incentives aligned with the interests of our shareholders. The Compensation Committee and the Board of Directors believe that the compensation package presented to you for your approval accomplishes those objectives in a reasonable way. The Company retained the services of a third-party compensation consultant, Meridian Compensation Partners, LLC, in connection with our structuring of Mr. Bell's package. The package was constructed within the confines of the senior executive benchmarking study produced by Meridian for this purpose and our shareholder-approved Compensation Policy.

Because of the previously announced strategic alternatives process, the Compensation Committee structured the CEO's compensation package to provide appropriate incentives for either a near-term strategic transaction or, if such a transaction does not transpire, a long-term restructuring and rebuilding of the Company and shareholder value. A detailed description of the elements of the package is provided in the proxy statement mailed to shareholders on June 26, 2017. Among the features we want to be sure are clear are the following:

If there is a strategic transaction involving the Company before May 8, 2018:

Mr. Bell will receive a Special Transaction Bonus ranging from $0.00 to $2.5 million, depending on the proceeds payable to the shareholders as a result of the transaction as provided in the Employment Agreement.

125.    If Mr. Bell is terminated without Cause or For Good Reason in connection with a change in control ("CIC") transaction, he will receive severance pay equal to one times his salary and bonus; and only if the transaction is at a price equal to or greater than $9.51 per share and the CIC agreement is executed after November 8, 2017 (six months from his May 8 employment agreement), Mr. Bell will be entitled to additional severance of $1 million.

## Class Action Allegations

126.    Plaintiff brings this action individually and as a class action on behalf of all holders of MAGICJACK stock who are being, and will be, harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or

affiliated with, any Defendant, including the immediate family members of the Individual Defendant.

127.    The Defendants' participated in the statements and distribution made Proxy Statements complained of herein.  Said defective Proxy Statements prevented Plaintiff and members of the Class who, due to the Defendants' actual knowledge, actions and  inactions complained of herein,  were from making an  informed decision on how to vote their stock shares on connection with the April 19, 2017 and July 31, 2017 Proxy Statement Solicitations, the Class Period.

128.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

129.    The Class is so numerous that joinder of all members is impracticable. According to the Form 10-Q Quarterly Report filed with the SEC. There were 16,041,017 ordinary shares with no par value outstanding at April 30, 2017. common stock outstanding. These shares are held by thousands of beneficial holders who are geographically dispersed across the country.

130.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

(a)  Whether Defendants violated Section 14(a) of the Exchange Act and
     Rule 14a-9 promulgated thereunder a;

(b)  Whether the Individual Defendants have violated Section 20(a) of the
     Exchange Act; and

(c) Whether Plaintiff and the other members of the Class.

131. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

132. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

133. The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

134. Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

135. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class a whole.

136. Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of himself and the Class to prevent irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

137. Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of magicJack during the Class Period (the "Class"). Excluded from the

Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

138.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, magicJack common stock was actively traded on the Nasdaq. While the exact number of Class members can only be ascertained through discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by magicJack and/or its transfer agent.

139.   Plaintiff's claim is typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

140.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

141.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      Did Individual Defendants solicit stockholder approval with a materially false, misleading and/or inform proxy statement;

b)      Is the Class entitled to injunctive relief and/or damages as a result of Defendants' wrongful conduct;

c)      Whether Defendants have disclosed and will disclose all material facts to stockholders; and;

        d)      Whether Plaintiff and the other members of the Class would be irreparably harmed if the vote proceeds.

131.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

132.  Plaintiffs will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

133.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

134.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### (Against All Defendants For Violations of Section 10(b)
### and Rule 10b-5 Promulgated Thereunder)

135.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

136.   Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

137.   As discussed above, magicJack filed and delivered a Proxy to its stockholders, which defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above. As a result,

138.   Defendants violated § 14(a) and Rule 14a-9 of the Exchange Act by issuing the Proxy in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices. Defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.   The Proxy was prepared, reviewed and/or disseminated by Individual Defendants. It misrepresented and/or omitted material facts, including material information, and potential conflicts of interest faced by certain Individual Defendants.

140.   In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of §14(a) and Rule 14a-9 of the Exchange Act. By virtue of their positions within the Company and/or responsibility for the process in the preparation of the Proxy,

defendants were aware of this information and their obligation to disclose this information in the Proxy.

141.    The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding whether to vote. In addition, a reasonable investor would view the information identified above which has been omitted from the Proxy as altering the "total mix" of information made available to stockholders.

142.    Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Proxy, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information, they allowed it to be omitted from the Proxy, rendering certain portions of the Proxy materially incomplete and therefore misleading.

143.    The misrepresentations and omissions in the Proxy are material to Plaintiff, and Plaintiff will be deprived of a shareholder's entitlement entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the stockholder vote.

## COUNT II
### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

144.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

145.    The Individual Defendants acted as controlling persons of magicJack within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of magicJack and participation in and/or awareness

of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

146.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

147.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. They were thus directly in the making of the Proxy.

148.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

149.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

150.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.  Determining declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

B.  declaring that the April and July Proxy Statements is materially false or misleading;

C.  enjoining, any and all payments tied to the two defective proxy statements preliminarily and permanently;

D.  in the event that a change of control transaction is consummated before the entry of this Court's final judgment, rescinding all payments tied to the false proxies which deprived Defendants of fair corporate suffrage and awarding Plaintiffs and the Class damages;

E.  directing that Defendants account to Plaintiffs and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

F.  awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

G.      granting Plaintiff and the other members of the Class such further relief as the

Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  August 11, 2017                              Respectfully submitted,

                                                     **KYLE CHARLES YOUNG, PL**


                                                     By: /s/ Kyle C. Young_____
                                                          Kyle Charles Young, Esq.
                                                          FBN 0060017
                                                          205 Worth Avenue #201
                                                          Palm Beach, FL 33480
                                                          561-635-1114
                                                          kcy@lawyer.com

Dated:  August 11, 2017                              Respectfully submitted,

                                                     **FINKELSTEIN & KRINSK LLP**


                                                     By: /s/Jeffrey R. Krinsk_____
                                                          Jeffrey R. Krinsk, Esq.
                                                          (Pro Hac Vice In Process)
                                                          550 West C Street, Suite 1760
                                                          San Diego, CA 92101
                                                          (619) 238-1333
                                                          jrk@classactionlaw.com
                                                          *Attorneys for Plaintiffs and the Class*

## SWORN CERTIFICATION OF PLAINTIFF

## MAGIC JACK CORPORATION SECURITIES LITIGATION

I, Robert Freedman, individually, and/or in my capacity as trustee and/or principal for accounts listed on Schedule A, certify that:

1.  I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase Magic Jack Corporation the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in MagicJack during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

7/31/17
Date

ROBERT FREEDMAN

341986.1

## <u>PSLRA ATTACHMENT "A"</u>
## <u>"TRANSACTIONS"</u>

Transactions relevant to Class Period:

- 25,000 shares held as of the printing of the April 19th, Proxy (March 15, 2017);

- 25,000 shares/votes both on Proxy Slated for April 19, 2017 vote  and;

- 25,000 shares/votes for Proxy Slated for the  July 31, 2017, vote.